1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   THOMAS LEE GLEASON, JR.,                No.  2:20-cv-00369-TLN-CKD P

12                 Plaintiff,

13        v.                                 FINDINGS & RECOMMENDATIONS

14   CDCR, et al.,

15                 Defendants.

16

17   I.      Introduction

18          Plaintiff Thomas Lee Gleason, Jr., a state prisoner proceeding pro se, filed a civil rights

19   action seeking relief under 28 U.S.C. § 1983.  In the first amended complaint, Gleason alleges

20   that defendant Dr. Largoza's revocation of his housing accommodations constituted deliberate

21   indifference to his serious medical needs under the Eighth Amendment, retaliation under the First

22   Amendment, and violated California's Bane Act and Disabled Persons Act.  He also claims that

23   defendants Largoza and the California Department of Corrections and Rehabilitation (CDCR)

24   violated Title II of the American with Disabilities Act (ADA) and Section 504 of the

25   Rehabilitation Act (Rehabilitation Act) when Largoza concluded that he did not need a bottom-

26   bunk accommodation.  Defendants moved for summary judgment on all claims.  (ECF Nos. 44,

27   47-50.)  For the reasons stated below, this Court recommends granting defendants' motion for

28   summary judgment as to plaintiff's federal law claims and dismissing plaintiff's state law claims

1

1    without prejudice.

2    II.    <u>Background</u>

3         Gleason filed his first amended complaint in July 2020, raising claims against CDCR and

4    Largoza.  (ECF No. 17.)  He alleges that, on July 23, 2019, he was called to the medical facility

5    and saw Largoza.  (<u>Id.</u> at 3.)  During the appointment, Largoza asked him why he was housed on

6    a lower bunk and lower tier because "that's for pussies and sissies. [You're] not a pussy or a sissy

7    are you?"  (<u>Id.</u>)  Largoza then asked him if he had filed a medical complaint against the medical

8    staff and chief medical examiner, which Gleason affirmed.  (<u>Id.</u>)  Largoza allegedly replied

9    "that's where you fucked up" and told Gleason to withdraw his complaint otherwise Largoza

10   would remove his housing restrictions, "medical chronos," and crutches.  (<u>Id.</u> at 3-5.)   If Gleason

11   filed another medical complaint, Largoza threatened to transfer him to Pelican Bay State Prison.

12   (<u>Id.</u> at 4.)  Gleason told Largoza that he cannot safely climb up to an upper bunk because he has

13   limited range of motion in his right wrist, arthritis, bad knees, and degenerative disc disease.  (<u>Id.</u>

14   at 3-4.)  Largoza removed his housing restrictions.  (<u>Id.</u> at 3.)

15        On July 25, 2019, Gleason alleges that he was ordered to move to an upper bunk.  (<u>Id.</u> at

16   5.)  While trying to climb up to his upper bunk, he fell and hit his head.  (<u>Id.</u>)  Gleason was taken

17   to the hospital, diagnosed with a neck sprain, and treated with pain medication.  (<u>Id.</u>)  He

18   continues to suffer dizzy spells and blackouts.  (<u>Id.</u> at 6.)  Based on these factual allegations,

19   Gleason claims that Largoza retaliated against him in violation of the First Amendment, acted

20   with deliberate indifference to a serious medical need in violation of the Eighth Amendment, and

21   violated the California Disabled Persons Act and the Bane Act.  He also claims that Largoza and

22   CDCR violated the ADA and the Rehabilitation Act.

23        Defendants answered the operative complaint on August 2, 2021, raising a qualified

24   immunity affirmative defense.  (ECF No. 30.)  On May 3, 2022, defendants moved for summary

25   judgment on all claims.  (ECF No. 44.)  Plaintiff opposed the motion, and defendants filed a

26   reply.  (ECF Nos. 47-50.)

27   III.   <u>Legal Standards for Summary Judgment</u>

28        "The court shall grant summary judgment if the movant shows that there is no genuine

2

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

56(c)).  "Where the non-moving party bears the burden of proof at trial, the moving party need

only prove that there is an absence of evidence to support the non-moving party's case."  In re

Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at

325); see also Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment (recognizing that

"a party who does not have the trial burden of production may rely on a showing that a party who

does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").

Indeed, summary judgment should be entered, "after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at

trial."  Celotex Corp., 477 U.S. at 322.  "[A] complete failure of proof concerning an essential

element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to

the opposing party to establish that a genuine issue as to any material fact actually exists.  See

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986).  In attempting to

establish the existence of a factual dispute, the opposing party may not rely upon the allegations

or denials of its pleadings and is required to tender evidence of specific facts in the form of

affidavits or admissible discovery to support its contention that a dispute exists.  See Fed. R. Civ.

P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in

contention is material, i.e., a fact that might affect the outcome of the suit under the governing

law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v.

Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

3

1   party, see Anderson, 477 U.S. at 250; Wool v. Tandem Computs., Inc., 818 F.2d 1433, 1436 (9th

2   Cir. 1987).

3       In the endeavor to establish the existence of a factual dispute, the opposing party need not

4   establish a material issue of fact conclusively in its favor.  It is sufficient that "'the claimed

5   factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the

6   truth at trial.'"  T.W. Elec. Serv., 809 F.2d at 630 (quoting  First Nat'l Bank of Arizona v. Cities

7   Serv. Co., 391 U.S. 253, 289 (1968)).  "The very mission of the summary judgment procedure is

8   to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

9   trial."  Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments; see also Matsushita,

10  475 U.S. at 587.

11      In resolving a summary judgment motion, the court examines facts cited by the parties

12  from the record including "depositions, documents, electronically stored information, affidavits or

13  declarations, stipulations (including those made for the purposes of the motion only), admissions,

14  interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c).  The evidence of the opposing

15  party is to be believed.  See Anderson, 477 U.S. at 255.  The court must draw all reasonable

16  inferences from the underlying facts in favor of the nonmoving party.  See Matsushita, 475 U.S.

17  at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

18  obligation to produce a factual predicate from which the inference may be drawn.  See Richards

19  v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

20  (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

21  simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S.

22  at 586.  "Where the record taken as a whole could not lead a rational trier of fact to find for the

23  non-moving party, there is no 'genuine issue for trial.'"  Id. (citation omitted).

24      On May 3, 2022, defendants provided plaintiff with contemporaneous notice of the

25  requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil

26  Procedure.  (ECF No. 44-2.)  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc).

27  ////

28  ////

4

1    IV.      Undisputed Facts[1]

2              Reasonable Accommodations

3         Title 15 of the California Code of Regulations, section 3999.394 regulates medically

4    necessary accommodations provided to inmates.  (ECF No. 44-5 at ¶ 2.)  An inmate can request

5    an accommodation in two ways.  First, an inmate may request an accommodation from a

6    physician.  (Id. at ¶ 3.)  Second, an inmate may request an accommodation by submitting a

7    Reasonable Accommodation Request, CDCR Form 1824, indicating the access issue, the reason

8    for the request, and the requested accommodation.  (Id. at ¶¶ 2, 4.)  The Reasonable

9    Accommodation Panel (RAP) reviews this request according to the Comprehensive

10   Accommodation Formulary Guidelines and issues a decision.  (Id. at ¶ 3.)  If an inmate disagrees

11   with the panel's decision, the inmate has the right to file a grievance.  (Id. at ¶ 4.)  Any

12   accommodations provided to inmates are noted in the inmate's prison records, also known as

13   "chronos."  (Id. at ¶ 6.)

14        Bottom bunk and lower tier accommodations are two types of housing accommodations

15   available to address disability access issues.  (Id.)  A bottom bunk accommodation indicates that

16   an inmate has a medical condition that requires him to be assigned to a bottom bunk.  (Id.)  A

17   lower tier accommodation assigns an inmate to a cell on a lower tier in a multi-tiered housing unit

18   due to the inmate's medical needs.  (Id.)  CDCR will provide such accommodations only if they

19   are medically necessary, and conversely, will remove any accommodations that are no longer

20   medically indicated.  (Id. at ¶¶ 7-8)

21             Health Care Grievances

22        The Health Care Grievance Office receives and reviews inmates' health care grievances.

23   (ECF No. 44-7 at ¶ 2.)  The Health Care Grievance Coordinator or Health Care Grievance Office

24   Technician provides, usually by hand delivery, the Chief Executive Officer or designee the draft

25   institutional-level response to review and sign, typically on the same day.  (Id.)  If the Health

26

27   [1] For purposes of summary judgment, the Court finds these facts are undisputed following its
     review of ECF document numbers 44 and the attachments, 48, 49, and documents referenced
     therein. Where plaintiff has failed to properly address defendants' assertion of fact as required,
28   the undersigned considers the fact undisputed.  See Fed. R. Civ. Pro. 56(e)(2).

Care Grievance Officer identifies a grievance as a complaint against medical staff, the Chief Medical Executive, or her designee, will inform the medical staff against whom the grievance is directed about the grievance shortly before the Chief Medical Executive interviews the relevant medical staff about the grievance.  (Id. at ¶ 3.)  If the grievance is not a staff complaint, the Health Care Grievance Office's routine practice is to not inform any individuals referenced in the grievance about its existence or claims.  (Id.)  The Health Care Grievance Office informs the Chief Executive Officer or the Chief Physician and Surgeon, if delegated, of a grievance when the Health Care Grievance Coordinator or Health Care Grievance Office Technician delivers the draft institutional-level response to them for their review, approval, and signature.  (Id.)

Gleason filed a health care grievance on June 26, 2019, arguing that he should have been referred to pulmonology for chest pain and given an MRI and EKG for further evaluation.   (Id. at Ex. A.)  Dr. Largoza reviewed and approved the institutional-level response to this grievance.  (Id.)  The Health Care Grievance Office did not identify this grievance as a staff complaint.  (Id. at ¶ 6; ECF No. 44-8 at ¶ 9.)  Dr. Largoza became aware of this grievance on the date he signed the institutional-level response, September 10, 2019.  (ECF No. 44-7 at ¶ 5; see also ECF No. 44-6 at ¶¶ 23-24.)

Gleason's Reasonable Accommodation Requests

In 2015, Gleason was given a housing accommodation to be assigned to a bottom bunk and lower tier.  (ECF No. 44-6 at ¶ 10.)  In May 2019, Gleason submitted a housing accommodation request and met with Dr. Mo to renew his 2015 housing accommodation.  (Id. at ¶¶ 9-10.)   Dr. Mo noted that Gleason had a "well-documented history of chronic low back pain, but other than a recent exacerbation, which happened after he was asked by the officers to get a chrono or be moved, there had not been a significant documented back pain exacerbation for over a year."  (Id. at 26.)  Dr. Mo concluded that there was no objective evidence for lower tier housing and recommended that "a permanent low bunk chrono will be issued based on his 2015 granted appeal for a low bunk, based on his right wrist."  (Id. at Ex. B at 26)  On May 22, 2019, RAP approved his bottom bunk accommodation request.  (Id. at ¶ 12 & Ex. C at 29-20.)  Gleason met with Dr. Mo on May 24, 2019 and June 19, 2019.  During the May 24, 2019 visit, he stated

6

that he "cannot begin to play basketball before he feels the shortness of breath and discomfort." (Id. at ¶ 13 & Ex. D.)  During the June 19 visit, Gleason experienced an increased shortness of breath and weakness on his right side from his right clavicle to his sternum.  (Id. at ¶ 14 & Ex. E ("He says he definitely notes weakness on the right side when he tries to do push-ups now."))

On July 23, 2019, Dr. Largoza met with Gleason for a functional assessment, which included evaluating his need for accommodations.  (Id. at ¶ 15 & Ex. F.)  Gleason did not use an ambulatory assistive device to walk to the examination room.  (Id.)  In the medical notes, Largoza noted that Gleason "walked briskly and appears to be quite muscular and fit" and "sat down on the examination table without assistance on getting on and off."  (Id.)  During the medical examination, Gleason "states that he works as a yard crew without duty limitations."  (Id. at ¶ 16 & Ex. F; ECF No. 44-3 at 26-27 (Gleason testified that yard duty involves gathering trash with your hands, carrying a full trash bag up a hill, and discarding the trash bag.))  Dr. Largoza called his building officer who mentioned that Gleason plays basketball and has not used crutches or an assistive device.  (ECF No. 44-6 at ¶ 19 & Ex. F; see also ECF No. 44-3 at 31-32.)  When Largoza asked Gleason about his crutches, he said they were in the building and seemed defensive in his answers.  (ECF No. 44-6 at ¶ 18 & Ex. F ("Review of x-ray revealed old metatarsal fracture only."))  Based on his observation, Gleason's responses, and his yard work, Largoza's medical opinion was that Gleason does not require crutches or a lower bunk accommodation and has the ability to climb stairs.[2]  (Id. at ¶ 19 & Ex. F.)

On July 24, Gleason visited the Triage and Treatment Area for cervical strain after falling off his bunk.  (Id. at ¶ 20 & Ex. G.)  Gleason had a follow-up medical visit with Dr. Rohrer, and the progress notes indicated that Gleason was on Tylenol, "moves arms easily and normally," and has handgrip strength showing no muscular atrophy.  (Id.)  Dr. Rohrer ordered an x-ray of his spine, prescribed Tylenol and capsaicin cream, and ordered a medical follow-up appointment in 20 days.  (Id.)

---

[2] On November 26, 2018, in a form requesting medical services, Gleason requested to have a 19-pound lifting restriction removed from his prison file so he could be eligible to transfer to fire camp.  (ECF No. 44-3 at 17-18, 34-36.)

On August 8, 2019, Gleason had a medical visit with Dr. Cortes to discuss his request for bottom bunk and lower tier accommodations. (Id. at ¶ 21 & Ex. H; ECF No. 44-4 at ¶ 6.)  The progress notes from this visit state the following:

> The patient ambulated independently from his housing to the CHC medical facility. He is able to sit from a standing position and stand from a sitting position to a chair. He is able to climb on and off the exam table unassisted. He is able to sit on exam table with his hips and knees bent. He is able to extend lower legs. He has no severe muscle atrophy or motor deficits of his lower extremities. He has at least one functional upper limb. **This patient does not meet criteria for lower bunk chrono.**

(ECF No. 44-6 at Ex. H.)  It also states "5/5 muscle strength upper and lower extremities, good handgrip strength bilaterally."  (Id.; see also ECF No. 44-4 at ¶ 9 (noting that Gleason had normal to above-normal muscle strength in his upper and lower extremities and good handgrip in both hands.))  Dr. Cortes ordered an x-ray of the lumbar spine for further evaluation.  (ECF No. 44-4 at ¶ 9.)  Dr. Cortes concluded that Gleason did not qualify or need a bottom bunk or lower tier accommodation.  (Id. at ¶ 10.)

On August 14, 2019, the RAP denied Gleason's July 31, 2019 request for a bottom bunk and lower tier accommodation, referring to the medical progress notes from the July 24, 2019 Triage and Treatment Area visit, July 26, 2019 appointment with Dr. Rohrer, and August 8, 2019 appointment with Dr. Cortes.  (ECF No. 44-6 at ¶ 22 & Ex. I.)

Following up from his August medical visit, Gleason had a medical appointment with Dr. Cortes on September 9, 2019.  (ECF No. 44-4 at ¶¶ 12-13 & Ex. C.)  The progress notes indicate that Gleason could walk to get food and perform normal activities of daily living.  (Id.)  The x-rays showed that he had mild to moderate arthritis in his spine, and Dr. Cortes prescribed salsalate to reduce any pain and swelling.  (Id.)  Dr. Cortes declared that the absence of any references to Gleason's hands or wrists in the medical notes indicates that Gleason did not mention any such concerns at the appointment.  (Id. at ¶ 13.)  Gleason also had another medical visit with Dr. Cortes on September 20, complaining of joint pain in his knees, wrists, and ankles.  (Id. at ¶¶ 14-15 & Ex. D.)  Again, Gleason told the doctor that he was able to walk to get food and complete normal activities of daily living.  (Id.)  Dr. Cortes ordered x-rays of his knees, ankles, and wrists for further evaluation of his complaints.  (Id.)  He also examined Gleason's muscular strength and

concluded he had normal to above-normal muscle strength and the same in the lower and upper extremities.  (Id.)

On June 23, 2020, Gleason had his last medical visit with Dr. Cortes.  (Id. at ¶¶ 16-18 & Ex. E.)  His main complaint was a request for a bottom bunk accommodation.  Although Gleason could perform normal daily activities, he recounted his three right wrist bone fractures and decreased range of motion and grip strength in that hand.  (Id. at ¶ 16.)  Gleason reported that he strained his right wrist while climbing up to his top bunk two days ago and continues to experience pain in his right forearm when he flexes his right hand towards the top of his right forearm.  (Id.)  Dr. Cortes compared the results of his December 2019 and May 2015 right hand x-rays and concluded "[t]hat the x-ray indicated no swelling of soft tissue, which includes muscle, tendons, and ligaments; mild to moderate arthritic changes; and showed a healed scaphoid (wrist) fracture with an intact support screw."  (Id. at ¶ 17.)  Dr. Cortes recommended a bottom bunk accommodation based on Gleason's decreased right-hand grip strength.  (Id. at ¶ 18 & Ex. E.)

V.    Disputed Facts

In opposition to the motion for summary judgment, plaintiff submitted his own declaration signed under penalty of perjury.  (See ECF No. 48.)  Defendants respond to the declaration by simply asserting that plaintiff does not provide sufficient evidence to establish a genuine dispute.  (ECF No. 50 at 5.)

To the extent defendants argue that this declaration should not be considered, this Court disagrees.  The fact that this evidence is self-serving does not necessarily make it improper. "[D]eclarations are often self-serving, and this is properly so because the party submitting it would use the declaration to support his or her position. Although the source of the evidence may have some bearing on its credibility and on the weight it may be given by a trier of fact, the district court may not disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature." Nigro v. Sears, Roebuck & Co., 784 F.3d 495, 497 (9th Cir. 2015) (internal citation omitted); see also Ironhawk Techs., Inc. v. Dropbox, Inc., 2 F.4th 1150, 1166 (9th Cir. 2021). "However, a self-serving declaration does not always create a genuine issue of material fact for summary judgment: The district court can disregard a self-serving declaration

1   that states only conclusions and not facts that would be admissible evidence." Nigro, 784 F.3d at

2   497-98 (concluding that the district court erred in disregarding plaintiff's declaration and

3   deposition testimony that was "based on personal knowledge, legally relevant, and internally

4   consistent"); see also F.T.C. v. Publishing Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir.

5   1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence,

6   is insufficient to create a genuine issue of material fact."). Here, plaintiff's declaration is based

7   on personal knowledge, is legally relevant, and is not internally inconsistent with the record. This

8   Court, therefore, must consider his declaration as true in evaluating defendants' motion for

9   summary judgment. See Jones v. Blanas, 393 F.3d 918, 922-23 (9th Cir. 2004). Because the

10  declaration mirrors the allegations in the first amended complaint, this Court does not recount

11  those facts here. (ECF No. 48.)

12  VI.   Discussion

13          A.   Eighth Amendment Deliberate Indifference Claim

14          Gleason alleges that Largoza was deliberately indifferent to his serious medical needs

15  when Largoza determined that he did not need to be assigned to a bottom bunk or lower tier cell.

16  Largoza disagrees, arguing that his conclusion was "consistent with CCHCS policy, California

17  regulations, the contemporaneous medical opinions of other medical experts, and his own medical

18  opinion" and does not constitute deliberate indifference. (ECF No. 44 at 22.)

19          The treatment a prisoner receives while incarcerated and the conditions of his confinement

20  are subject to the Eighth Amendment. Helling v. McKinney, 509 U.S. 25, 31 (1993); see also

21  DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 198-200 (1989). A prison

22  official violates the Eighth Amendment when he acts with "deliberate indifference" to the serious

23  medical needs of an inmate. See Farmer v. Brennan, 511 U.S. 825, 828 (1994); Wilson v. Seiter,

24  501 U.S. 294, 297 (1991); Estelle v. Gamble, 429 U.S. 97, 104 (1976); Doty v. County of Lassen,

25  37 F.3d 540, 546 (9th Cir. 1994). To state a claim, the prisoner must show that (1) objectively,

26  the prison official's deprivation was sufficiently serious, and (2) subjectively, the prison official

27  acted with sufficiently culpable state of mind. See Wilson, 501 U.S. at 298-99. The Eighth

28  Amendment's deliberate indifference standard is a "high legal standard." See Toguchi v. Chung,

10

1    391 F.3d 1051, 1060 (9th Cir. 2004).

2            To meet the objective standard, the plaintiff must show that the medical need is serious.

3    A medical need is serious "if the failure to treat the prisoner's condition could result in further

4    significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin v. Smith, 974

5    F.2d 1050, 1059 (9th Cir. 1991) (citation omitted), overruled on other grounds by WMX Techs.,

6    Inc. v. Miller, 104 F.3d 1133 (9th Cir.1997) (en banc).  If a prisoner establishes the existence of a

7    serious medical need, he must also meet the subjective standard, showing that prison officials

8    responded to the serious medical need with deliberate indifference.  Farmer, 511 U.S. at 834.

9    "[T]he official must both be aware of facts from which the inference could be drawn that a

10   substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837.  In

11   general, deliberate indifference may be shown when prison officials deny, delay, or intentionally

12   interfere with medical treatment, or in the way prison officials provide medical care.  Hutchinson

13   v. United States, 838 F.2d 390, 394 (9th Cir. 1988).  "A showing of medical malpractice or

14   negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment."

15   Toguchi, 391 F.3d at 1060; see also Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990)

16   ("While poor medical treatment will at a certain point rise to the level of a constitutional

17   violation, mere malpractice, or even gross negligence, does not suffice.")

18           To prevail, Gleason must demonstrate that Largoza knew when he rescinded the housing

19   accommodations on July 23, 2019 that Gleason's right wrist limitation created a substantial risk

20   of injury from accessing the upper bunk or upper tier.  Gleason has not met this standard.  There

21   are two stories as to what occurred at the July 23, 2019 medical examination between Gleason

22   and Largoza.  Gleason provides a signed declaration stating that Largoza threatened to rescind his

23   accommodations and take away his crutches if he did not withdraw his health care grievance.

24   (ECF No. 48.)  In the declaration, Gleason declares that Largoza rescinded his housing

25   accommodations when he refused to withdraw his grievance despite knowing that he has limited

26   use of his right wrist and has fallen several times after trying to gain access to an upper bunk,

27   injuring himself.  (Id.)  Largoza, on the other hand, presents a different account.  Largoza

28   provides evidence that, based on his medical observation and Gleason's yard work, he concluded

                                                    11

1    that Gleason does not have a medical need for crutches or a lower bunk accommodation and has

2    the ability to climb stairs.  (ECF No. 44-6 at ¶ 19 & Ex. F.)  Although this Court must view the

3    evidence and draw all inferences in the light most favorable to the nonmoving party, this

4    requirement only applies to reasonable inferences.  "[T]he mere existence of *some* alleged factual

5    dispute between the parties will not defeat an otherwise properly supported motion for summary

6    judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson, 477 U.S.

7    at 247-48.  "When opposing parties tell two different stories, one of which is blatantly

8    contradicted by the record so that no reasonable jury could believe it, a court should not adopt

9    that version of the facts for purposes of ruling on a motion for summary judgment."  Scott v.

10   Harris, 550 U.S. 372, 380 (2007).

11          That is the case here.  Largoza's conclusion that Gleason did not have a medical need for

12   a housing accommodation is bolstered by other undisputed evidence.  First, reports from two non-

13   defendant doctors who examined Gleason around the same time period did not recommend a

14   housing accommodation.[3]  Dr. Rohrer observed that Gleason could move his arms easily and

15   normally and his handgrip was within normal range, showing no signs of muscular atrophy.

16   (ECF No. 44-6 at ¶ 20 & Ex. G; see also ECF No. 50-2 at ¶ 8.)  Dr. Cortes noted that Gleason has

17   normal to above-normal muscle strength and grip and concluded that Gleason does not meet the

18   criteria for bottom bunk accommodation.  (ECF No. 44-6 at ¶ 21 & Ex. H; see also ECF No. 44-4

19   at ¶¶ 9-10.)  Second, Gleason played basketball, worked on yard crew, and made a request to

20   remove a lifting restriction so he could go to fire camp, all of which are inconsistent with his

21   claim that his right wrist entitled him to a housing accommodation.  (ECF No. 44-6 at ¶¶ 16, 19 &

22   Ex. F; ECF No. 44-3 at 17-18, 26-27, 31-36.)  Third, on August 14, 2019, the RAP denied

23   Gleason's July 31, 2019 request for a bottom bunk and lower tier accommodation.  (ECF No. 44-

24   6 at ¶ 22 & Ex. I.)  It was only after he reinjured his right wrist in June 2020 that a doctor

25   identified a decrease in right-hand grip strength and recommended a bottom bunk housing

26

---

27   [3] In fact, the record shows Gleason's housing accommodations fluctuated during his prison
     tenure.  (ECF No. 47 at 2-3; ECF No. 50-2 at ¶¶ 5-6; ECF No. 44-6 at ¶¶ 10-22; ECF No. 44-4 at
28   ¶¶ 6-18.)

1   accommodation.  (ECF No. 44-4 at ¶¶ 16-18.)  Lastly, there is evidence that Largoza did not

2   know of the pending health care grievance at the time of the medical examination in July 2019.

3   (ECF No. 44-7 at ¶ 5; see also ECF No. 44-6 at ¶¶ 23-24.)

4        Gleason has not provided any medical opinion demonstrating that his serious medical

5   condition required a bottom bunk or lower tier accommodation between July 2019 and June 2020.

6   His own declaration is insufficient for this purpose because a layperson is not qualified to offer

7   medical opinions.  Without any evidence to support this argument, Gleason's belief that his

8   medical condition warranted such accommodations amounts to a difference of opinion with his

9   medical treatment.  But a mere difference in opinion concerning the appropriate medical

10  treatment cannot be the basis of an Eighth Amendment claim.  Jackson v. McIntosh, 90 F.3d 330,

11  332 (9th Cir. 1996), overruled in part on other grounds by Peralta v. Dillard, 744 F.3d 1076 (9th

12  Cir. 2014) (en banc); see also Hamby v. Hammond, 821 F.3d 1085, 1092 (9th Cir. 2016).  When

13  there are two courses of medical treatments, the plaintiff "must show that the course of treatment

14  the doctors chose was medically unacceptable under the circumstances" and that the doctors

15  "chose this course in conscious disregard of an excessive risk to plaintiff's health."  Jackson, 90

16  F.3d at 332.  The record is devoid of any evidence that Largoza's choice to rescind the

17  accommodation was medically unacceptable.

18       Even if this Court draws a reasonable inference that Gleason's worsening condition of his

19  right wrist was caused by denying his housing accommodation requests, this would be

20  insufficient to survive summary judgment.  At best, this would state a claim of negligence.  A

21  claim of negligence, however, does not amount to a valid claim of deliberate indifference under

22  the Eighth Amendment.  See Estelle, 429 U.S. at 106 ("[A] complaint that a physician has been

23  negligent in diagnosing or treating a medical condition does not state a valid claim of medical

24  mistreatment under the Eighth Amendment").  Because there is no genuine issue of material fact,

25  this Court recommends granting summary judgment on the Eighth Amendment claim.

26       B.  ADA and Rehabilitation Act Claims

27       Next, Gleason claims that Largoza and CDCR violated the ADA and the Rehabilitation

28  Act when Largoza concluded that Gleason did not need a bottom-bunk accommodation.  Largoza

13

and CDCR argue that they acted consistent with the statutes, Gleason can only proceed against Largoza in his official capacity, and damages are not warranted because neither Largoza nor CDCR acted with deliberate indifference.  (ECF No. 44 at 25-31.)

The ADA and Rehabilitation Act prohibit discrimination on the basis of a disability. Lovell v. Chandler, 303 F.3d 1039, 1052 (9th Cir. 2002).  Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The Rehabilitation Act is almost identical, providing "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance …."  29 U.S.C. § 794(a).  "There is no significant difference in analysis of the rights and obligations created by the [two Acts]."  Zukle v. Regents of Univ. of Cal., 166 F.3d 1041, 1045 n.11 (9th Cir. 1999).  To state a claim under either the ADA or Rehabilitation Act, plaintiff must prove: "(1) he 'is an individual with a disability;' (2) he 'is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities;' (3) he 'was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity;' and (4) 'such exclusion, denial of benefits, or discrimination was by reason of [his] disability.'"  McGary v. City of Portland, 386 F.3d 1259, 1265 (9th Cir. 2004) (quoting Thompson v. Davis, 295 F.3d 890, 895 (9th Cir. 2002) (per curiam)); see also Lovell, 303 F.3d at 1052.  A public entity must make reasonable modifications to avoid discriminating on the basis of a disability, unless the modification fundamentally alters the nature of the service, program, or activity.  28 C.F.R. § 35.130(b)(7)(i); see also Pierce v. County of Orange, 526 F.3d 1190, 1215 (9th Cir. 2008).  Because "a plaintiff cannot bring an action under 42 U.S.C. § 1983 against a State official in her individual capacity" under the ADA or Rehabilitation Act, this Court construes his claim against Largoza, in his official capacity, and therefore against CDCR.  Vinson v. Thomas, 288 F.3d 1145, 1156 (9th Cir. 2002); see also Sims v. Torre, No. 21-15778, 2022 WL

14

1   4234961, at *1 (9th Cir. Sept. 14, 2022).

2         Neither the ADA nor the Rehabilitation Act create a remedy for medical malpractice or

3   negligence in providing adequate treatment for a disability.  Simmons v. Navajo Cnty., 609 F.3d

4   1011, 1022 (9th Cir. 2010) ("The ADA prohibits discrimination because of disability, not

5   inadequate treatment for disability."); see also O'Guinn v. Nevada Dep't of Corrections, 468 F.

6   App'x 651, 653 (9th Cir. 2012).  Here, Gleason does not argue that he was denied adequate

7   medical treatment; rather, he alleges denial of a reasonable housing accommodation for his

8   disability.  See Munoz v. California Dep't of Corrs. & Rehab., 842 F. App'x 59, 62 (9th Cir.

9   2021).  A failure to provide a reasonable accommodation for a disability can constitute

10  discrimination.  See Morris v. California, No. 21-16059, 2022 WL 2901730, at *1 (9th Cir. July

11  22, 2022); Armstrong v. Brown, 732 F.3d 955, 957 (9th Cir. 2013) (noting that disability

12  accommodations under the ADA and Rehabilitation Act include accessible beds); Updike v.

13  Multnomah Cnty., 870 F.3d 939, 951-52 (9th Cir. 2017); Vinson, 288 F.3d at 1154.

14        To recover monetary damages under either Act, plaintiff must also show "intentional

15  discrimination on the part of the defendant."  Duvall v. County of Kitsap, 260 F.3d 1124, 1138

16  (9th Cir. 2001).  "Deliberate indifference requires both knowledge that a harm to a federally

17  protected right is substantially likely, and a failure to act upon that likelihood."  Id. at 1139.

18  When a plaintiff has alerted the public entity to his need for an accommodation, the public entity

19  is on notice, and plaintiff has satisfied the first element of the deliberate indifference test.  Id.  For

20  the second factor, the public entity is required to "undertake a fact-specific investigation to

21  determine what constitutes a reasonable accommodation."  Id.  To satisfy the second element, "a

22  failure to act must be a result of conduct that is more than negligent, and involves an element of

23  deliberateness."  Id.

24        To state a valid ADA or Rehabilitation Act claim, Gleason must first show that he has a

25  qualified disability.  The statute defines disability as "(A) a physical or mental impairment that

26  substantially limits one or more major life activities of such individual; (B) a record of such an

27  impairment; or (C) being regarding as having such an impairment." 42 U.S.C. § 12102(1).  At

28  the summary judgment stage, 'precedent does not require comparative or medical evidence to

1  establish a genuine issue of material fact regarding the impairment of a major life

2  activity….Rather, … a plaintiff's testimony may suffice to establish a genuine issue of material

3  fact.'"  See Rohr v. Salt River Project Agric. Improvement & Power Dist., 555 F.3d 850, 858-59

4  (9th Cir. 2009); Munoz v. California Dep't of Corrs. & Rehab., No. 1:16-cv-01103, 2022 WL

5  183494, at *7 (E.D. Cal. Jan. 20, 2022).  Conclusory declarations, however, are insufficient;

6  "'[t]o survive summary judgment, an affidavit supporting the existence of a disability must not be

7  merely self-serving and must contain sufficient detail to convey the existence of an impairment."

8  Id.

9      After viewing the evidence in a light most favorable to Gleason, this Court concludes that

10  Gleason has not shown he has a qualifying disability.  Gleason asserts that his right wrist has

11  limited range of motion from being broken three times.  (ECF No. 48 at 2.)  He also claims that

12  he told Largoza that he has fallen several times while climbing to a top bunk and hurt himself.

13  (Id.)  His declaration is consistent with other records indicating that Gleason had injured his right

14  wrist, required operations to repair the damage, and, as a result, was previously approved for

15  bottom bunk accommodation.  (ECF No. 49 at 19, 29, 37, 40, 42-50, 52.)  However, these facts

16  are inconsistent with the fact that he worked on yard crew, played basketball, and requested to

17  have a 19-pound lifting restriction removed to qualify for fire camp.[4]  (ECF No. 44-6 at ¶¶ 16, 19,

18  Ex. F; ECF No. 44-3 at 16-18, 26-27, 31-36.)  Non-defendant doctors also evaluated Gleason a

19  few days to weeks after his medical appointment with Largoza and noted that Gleason had normal

20  to above-normal strength in his extremities.  (ECF No. 44-6 at ¶¶ 20-21, Ex. G, Ex. H; see also

21  ECF No. 50-2 at ¶ 8; ECF No. 44-4 at ¶¶ 9-10.)  Because this Court is only required to draw

22  reasonable inferences in plaintiff's favor, this Court finds that Gleason has not shown that he

23  experienced a qualifying impairment under the ADA and Rehabilitation Act.

24      But even assuming Gleason had a qualifying disability, his claim seeking monetary

25  damages would fare no better because he has not shown intentional discrimination.  This requires

26

27  _____

   [4] In his testimony, Gleason also stated "I wouldn't have been able to lift the 19-pounds on a
   regular basis due to my back. I know I couldn't have been able to do it." (ECF No. 44-3 at 17-
28  18.)

1  evidence that defendants had knowledge that violation of a federal right was substantially likely

2  and failed to act upon the possibility.  Duvall, 260 F.3d at 1139.  The first element, the knowledge

3  requirement, is satisfied when plaintiff alerts the public entity "to his need for accommodation (or

4  where the need for accommodation is obvious, or required by statute or regulation)...."  Id.  Once

5  a public entity is on notice, it is required to "undertake a fact-specific investigation to determine

6  what constitutes a reasonable accommodation...."  Id.  The second element, a failure to act, "must

7  be a result of a conduct that is more than negligent, and involves an element of deliberateness."

8  Id.

9       Here, the first element has been satisfied.  It is undisputed that Largoza and CDCR had

10  knowledge of Gleason's request for a reasonable accommodation.  (See, e.g., ECF No. 44-6 at ¶¶

11  9-11 & Ex. B (Gleason submitted a request for housing accommodation in May 2019, which Dr.

12  Mo reviewed and granted); id. at ¶ 12 & Ex. C (RAP approved the bottom bunk request on May

13  22, 2019); id. at ¶¶ 15-19 & Ex. F (Largoza met with Gleason in July 2019 to "re-evaluate his

14  durable medical equipment (DME) and functional status, which included evaluating his continued

15  need for existing accommodations and whether he needed additional accommodations" and

16  concluded that he does not require crutches or a lower bunk accommodation.))

17       Gleason's claim fails, however, because defendants performed the required fact-intensive

18  inquiry to determine whether the requested accommodation was appropriate.  Like the Eighth

19  Amendment claim, because Gleason and defendants tell two different stories as to why Largoza

20  rescinded Gleason's housing accommodations, this Court does not adopt Gleason's version of the

21  facts because it is "blatantly contradicted by the record so that no reasonable jury could believe."

22  Scott, 550 U.S. at 380.  Regarding Largoza, on July 23, 2019, Largoza conducted a functional

23  assessment of Gleason.  (Id. at ¶ 15 & Ex. F.)  The medical notes from that assessment state that

24  Gleason walked briskly without assistance to the examination room, and he appeared to be

25  muscular and fit.  (Id.)  In the examination room, Gleason got on and off the examination table

26  without help.  (Id.)  Gleason told Largoza that he left his crutches in his cell and worked on yard

27  crew without restrictions, which indicated that he did not have mobility issues.  (Id. at ¶ 16; id. at

28  ¶ 18 (an x-ray of his left foot showed a fully healed facture, which allowed him to walk without

1   signs of discomfort or injury).)  To better understand Gleason's functional status, Largoza called

2   Gleason's building officer who informed him that Gleason regularly plays basketball and does not

3   use crutches or any assistive device.  (Id. at ¶ 19 & Ex. F.)  Largoza concluded that Gleason did

4   not require a bottom bunk or lower tier accommodations, or crutches.  (Id. at ¶ 19.)

5          The CDCR also fulfilled its obligations to conduct a fact-intensive inquiry through the

6   actions of Largoza, Rohrer, Cortes, the Triage and Treatment Area, RAP panel, and review of

7   health care grievances.  From July 23, 2019, when Largoza concluded that Gleason did not need a

8   housing accommodation, to June 23, 2020, when Dr. Cortes recommended a bottom bunk

9   accommodation based on a recent wrist injury, Gleason had at least seven medical visits.  (ECF

10  No. 44-6 at ¶¶ 15-21; ECF No. 44-4 at ¶¶ 5-18.)  During this time period, Largoza and non-

11  defendant doctors concluded that he did not need a bottom bunk or lower tier housing

12  accommodation.  (ECF No. 44-6 at ¶¶ 19-21; ECF No. 44-4 at ¶¶ 6-18; ECF No. 50-2 at ¶¶ 7-8.)

13  Drs. Cortes and Rohrer physically examined Gleason, identifying normal to above-normal muscle

14  strength, good bilateral handgrip, and no severe muscular atrophy.  (ECF No. 44-6 at ¶ 20; ECF

15  No. 44-4 at ¶¶ 9, 14; ECF No. 50-2 at ¶¶ 7-8.)  Furthermore, on August 14, 2019, the RAP

16  reviewed and denied Gleason's July 31, 2019 request for a bottom bunk and lower tier

17  accommodation, referencing the medical progress notes from the July 24, 2019 Triage and

18  Treatment area visit, July 26, 2019 appointment with Dr. Rohrer, and August 8, 2019

19  appointment with Dr. Cortes.  (ECF No. 44-6 at ¶ 22 & Ex. I.)  In an August 27, 2020 response to

20  a health care grievance, it noted that after a June 23, 2020 evaluation of Gleason's condition, "a

21  lower/bottom bunk was indicated and ordered. Per SOMS, you have an active chrono for a

22  lower/bottom bunk. No further intervention required at this time."  (Id. at Ex. K.)  This Court

23  should grant summary judgment in favor of defendants on plaintiff's ADA and Rehabilitation Act

24  claims.

25          C.  First Amendment Retaliation Claim

26          Gleason alleges that Largoza violated his First Amendment rights when Largoza revoked

27  his reasonable accommodations under the ADA in retaliation for refusing to withdraw his June

28  2019 health care grievance.  In the motion for summary judgment, Largoza contends that he did

1    not retaliate against Gleason in violation of the First Amendment.  (ECF No. 44 at 31.)

2          Prisoners have the First Amendment right to file prison grievances and pursue civil rights

3    litigation.  See Rhodes v. Robinson, 408 F.3d 559, 567 (9th Cir. 2005); Brodheim v. Cry, 584

4    F.3d 1262, 1269-73 (9th Cir. 2009).  This right provides a mechanism for prisoners to remedy any

5    prison injustices.  Any retaliatory actions taken against prisoners for exercising these rights also

6    "violate the Constitution quite apart from any underlying misconduct they are designed to shield."

7    Id.  A First Amendment retaliation claim within the prison context has five elements: "(1) An

8    assertion that a state actor took some adverse action against an inmate (2) because of (3) that

9    prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First

10   Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."

11   Id. at 567-68.

12         To survive summary judgment, plaintiff must show that there is a genuine issue of

13   material fact as to each element.  Brodheim, 584 F.3d at 1269 n.3.  As to the first element, there is

14   undisputed evidence that Largoza took adverse action against Gleason when he rescinded his

15   housing accommodations in July 2019.  Filing a health care grievance is protected conduct,

16   satisfying the third element.  Rhodes, 408 F.3d at 568.

17          The more challenging issue concerns the second element; whether there is a genuine issue

18   of material fact that Largoza took adverse action because of Gleason's protected conduct.  To

19   show causation, "a plaintiff must show that his protected conduct was 'the substantial' or

20   'motivating' factor behind the defendant's conduct."  Brodheim, 584 F.3d at 1271 (citation

21   omitted); see also Bruce v. Ylst, 351 F.3d 1283, 1288 (9th Cir. 2003) (on summary judgment,

22   "[plaintiff must] put forth evidence of retaliatory motive, that, taken in the light most favorable to

23   him, presents a genuine issue of material fact" as to the prison official's intent to retaliate against

24   his protected conduct.)

25         Here, Gleason's declaration states that during his medical appointment on July 23, 2019,

26   Largoza asked Gleason if he had filed a medical complaint against the medical staff and chief

27   medical examiner.  (ECF No. 48 at 1.)  Gleason had filed a health care grievance about a month

28   earlier, arguing that he should have received additional health care for his chest pain.  (ECF No.

19

44-7 at ¶ 4 & Ex. A.)  Largoza stated "that's where you fucked up" and warned that he would

remove Gleason's housing restrictions, medical chronos, and crutches if Gleason did not

withdraw the medical complaint.  (ECF No. 48 at 2-3.)  Gleason refused to withdraw his

grievance, and Largoza removed his housing restrictions.  (Id. at 3-4.)  Based on Gleason's

evidence, a jury could infer a causal connection based on the timing of his health care grievance

and his medical appointment with Largoza.  See, e.g., Bruce, 351 F.3d at 1288. If the record

ended there, plaintiff would have established a genuine issue of material fact on this element.

Unfortunately for plaintiff, it does not.  "True, timing can properly be considered as

circumstantial evidence of retaliatory intent…[i]n this particular case, however, there is little else

to support the inference."  Pratt v. Rowland, 65 F.3d 802, 808 (9th Cir. 1995) (internal citation

omitted).  There is undisputed evidence that Largoza had no knowledge of Gleason's health care

grievance at the July 2019 medical appointment.  First, according to Health Care Grievance

Office practice, for non-staff complaints, the office does not inform any individuals referenced in

the grievance about its existence or claims.  (ECF No. 44-7 at ¶ 3.)  The relevant grievance was

not identified as a staff complaint.  (Id. at ¶ 5; ECF No. 44-8 at ¶ 9.)  Second, the Health Care

Grievance Coordinator or Health Care Grievance Office Technician provides the Chief Executive

Officer or designee the draft institutional-level response to review and sign, typically on the same

day.  (ECF No. 44-7 at ¶ 3.)  Largoza reviewed and approved the institutional-level response to

Gleason's grievance on September 10, 2019.  (Id. at ¶ 4 & Ex. A.)  Under the office's routine

practice, it would "not have informed Dr. Largoza of the existence or contents of grievance SOL-

HC-19000503 prior to the date he signed the institutional-level response on September 10, 2019."

(Id. at ¶ 5.)  Third, Dr. Largoza first became aware of this grievance on the date he signed the

institutional-level response, September 10, 2019.  (ECF No. 44-6 at ¶¶ 23-24 ("I have never

spoken with Gleason about any health care grievances he has filed, nor am I aware of any

communications between he or I regarding any health care grievances he has filed, beyond my

role in approving and conveying institutional-level responses to health care grievances."))

Gleason's declaration is the only "evidence" in the record that Largoza knew about the health

care grievance before the medical appointment.  But this is pure speculation.  Based on the

record, Gleason has not shown that Largoza rescinded his housing accommodations as result of

exercising his First Amendment right to file a grievance.[5]  This Court recommends granting

summary judgment on this claim.

    D.  State Law Claims (California Disabled Persons Act & Bane Act)

    Based on the above recommendations, this Court declines to exercise supplemental

jurisdiction over plaintiff's state law claims and recommends dismissing them without prejudice.

Wade v. Regional Credit Ass'n, 87 F.3d 1098, 1101 (9th Cir. 1996).[6]

VII.   Conclusion

    Accordingly, IT IS HEREBY RECOMMENDED that:

1.   Defendants' motion for summary judgment (ECF No. 44) be granted as to plaintiff's federal law claims; and

2.   Dismiss all state law claims without prejudice in light of the dismissal of all plaintiff's federal claims.

    These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The

/////

/////

/////

---

[5] There is also undisputed evidence that Largoza acted in accordance with a legitimate penological purpose when he removed Gleason's housing accommodation.  CDCR has a limited number of bottom bunks and lower tier housing and provides those accommodations only when they are medically necessary.  (ECF No. 44-5 at ¶¶7-8.)  As a result, CDCR revokes those accommodations when they are no longer medically necessary.  (Id.)

[6] In the interests of judicial economy, this Court declines to separately address defendant's remaining arguments in support of summary judgment, including qualified immunity.

1   parties are advised that failure to file objections within the specified time may waive the right to

2   appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3   Dated:  November 3, 2022

4                                                                        _____
                                                                         CAROLYN K. DELANEY
5                                                                        UNITED STATES MAGISTRATE JUDGE

6

7   20
    glea0369.msj

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28